**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BEN GYADU | : | CIVIL NO. 3:02-CV-01271 (AWT) |
|     *Plaintiff* | : | |
| | : | |
|     v. | : | |
| | : | |
| MAURA O'CONNELL | : | |
|     *Defendant* | : | FEBRUARY 24, 2005 |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

This action is one of several federal actions the pro se plaintiff, Ben Gyadu, has filed challenging state court foreclosure proceedings that were commenced against him in 1994 and continued for the better part of a decade.  See, e.g., Gyadu v. Hartford Ins. Co., 283 F. Supp. 2d 740, 741 (D. Conn. 2003) (noting that "Gyadu has been a party to over twenty actions in this district alone" and citing seven independent federal proceedings arising out of the state foreclosure action).[1]  In this permutation, the plaintiff alleges that the defendant Maura O'Connell, an Assistant Clerk in the Connecticut Superior Court, maliciously violated a panoply of the plaintiff's constitutional and statutory rights by issuing an Execution for Ejectment against him.  As the evidence and the below discussion establish, this action is utterly without merit and this Court should grant the defendant's motion for summary judgment.

---

[1] The Connecticut Appellate Court, Second Circuit and United States Supreme Court have either sanctioned the plaintiff or limited his ability to make filings, in forma pauperis or otherwise.  See, e.g., Gyadu v. D'Addario Indus., Inc., 535 U.S. 953 (2002) ("As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petition in noncriminal matters from petitioner unless the docketing fee . . . is paid and the petition is submitted in compliance with Rule 33.1."); Gyadu v. Hartford Ins. Co., 197 F.3d 590, 590 (2d Cir. 1999) (per curiam) (characterizing the plaintiff as "a frequent litigant before this court and the district court" and enjoining him "from filing future actions in this Court except as provided by the procedures described herein.").

## II.    FACTS

The attached affidavits[2] and materials of which this Court may take judicial notice establish the following relevant facts:

In 1994, the Bella Vista Condominium Association ("Bella Vista") brought a condominium lien foreclosure action against the plaintiff, Benjamin Gyadu, in Connecticut state court alleging, inter alia, that he had failed to pay his condominium association fees.  See Melchionne Aff. at ¶¶ 3-4 (Exh. 2); see also Docket Sheet in Bella Vista Condo v. Gyadu, UWY-CV-94-0120500-S at 1 (hereinafter "Docket Sheet") (attached as exhibit 3).[3]  In January 2000, the Connecticut Superior Court entered a Judgment of Strict Foreclosure in favor of Bella Vista.  See Docket Sheet at p. 7, entry 226.00.  Mr. Gyadu's appeal from that judgment was dismissed and he exhausted all appellate procedures, including a writ of certiorari to the United States Supreme Court. See Memorandum of Decision in Bella Vista Condo v. Gyadu at 1 (attached as Exhibit C to O'Connell Aff.).

After Mr. Gyadu had exhausted his appellate remedies and the initial law day had passed, Bella Vista filed a Motion to Reopen Judgment of Strict Foreclosure and Set New Law Days.  See Motion to Reopen Judgment of Strict Foreclosure and Set New Law Days (attached as exhibit B to O'Connell Aff.).  Before the court acted on Bella Vista's motion, Mr. Gyadu filed a motion for extension of time and a motion for stay.

---

[2] Two affidavits are attached as exhibits.  Affidavit of Maura O'Connell ("O'Connell Aff.") (attached as exhibit 1); Affidavit of Eugene Melchionne ("Melchionne Aff.") (attached as exhibit 2).

[3] Judicial notice may be taken of docket sheets.  See, e.g., United States v. Doyle, 121 F.3d 1078, 1088 (7th Cir. 1997); United States v. Williams, 146 F. Supp. 2d 249, 256 (E.D.N.Y. 2001), vacated and remanded in part on other grounds, 29 Fed. Appx. 656 (2d Cir. 2002).

See Memorandum of Decision in Bella Vista Condo v. Gyadu at 2.  On August 6, 2001, the court granted Bella Vista's motion to reopen, setting the law day as August 28, 2001, and denied Gyadu's motions.  Id.  Mr. Gyadu did not appeal the court's ruling granting Bella Vista's motion to reopen.[4]

Mr. Gyadu then filed another motion to stay on August 10, 2001 and a motion to set aside on August 21, 2001.  Id.  In addition, during this time Mr. Gyadu filed two parallel motions in the federal district court to stay the state court proceedings, both of which were denied on August 20, 2001.  Id. On August 27, 2001, the state court held a hearing on Mr. Gyadu's outstanding motions and denied them in open court.  Id.

On August 28, 2001, the law day set by the court's August 6, 2001 ruling, Mr. Gyadu failed to redeem the property and filed a motion for temporary injunction to "keep the law days from running."  See O'Connell Aff. ¶ 9; Memorandum of Decision in Bella Vista Condo v. Gyadu at 3.  The other encumbrancers' law days also passed without them redeeming the property, with the result that absolute title vested in Bella Vista on September 4, 2001 pursuant to Connecticut law.  See O'Connell Aff. ¶ 9.

The court denied Mr. Gyadu's motion for temporary injunction on September 7, 2001.  Memorandum of Decision in Bella Vista Condo v. Gyadu at 3.  On September 12, 2001, Mr. Gyadu filed a motion to set aside the court's August 27, 2001 rulings, contending that all state court action should have been stayed because Mr. Gyadu had sought to remove the action to federal court.  Id.

---

[4] The Connecticut Rules of Appellate Procedure provide that, absent exceptions not applicable here, "an appeal must be filed within twenty days of the date notice of the judgment or decision is given."  Conn. Practice Bk. § 63-1 (attached as exhibit 4).

On or about September 24, 2001, Bella Vista's counsel, Eugene Melchionne, filed the Execution for Ejectment with a courtroom clerk at the Superior Court. Melchionne Aff. at ¶ 6 (Exh. 2).  There are not file stamps in the courtroom—they are located only in the clerk's office.  O'Connell Aff. ¶ 11; Melchionne Aff. ¶ 6.  In cases where Ms. O'Connell signs an Execution for Ejectment that has not been file stamped, she file stamps the document after having signed it.  O'Connell Aff. ¶ 11.  On October 17, 2001, Attorney Melchionne called the clerk's office concerning the signing of the Execution for Ejectment he had previously filed.  Melchionne Aff. ¶ 8.  He was informed that Judge West was considering Mr. Gyadu's motions and would not allow the execution to leave the courthouse until those motions were decided.  Id.

On November 1, 2001, the court issued a Memorandum of Decision rejecting Mr. Gyadu's argument that all state court action should have been stayed by his attempt to file a petition for removal because Mr. Gyadu's requests to file his removal petition in forma pauperis were denied and "[w]ithout a filing fee, or permission to proceed in forma pauperis, the petition was not effectively filed."  Memorandum of Decision in Bella Vista Condo v. Gyadu at 4.  The court concluded that "[c]onsequently, there was no stay in effect to prevent the state court action from proceeding as scheduled" and that "[s]ince this court had jurisdiction when it denied the defendant's motions on August 27, 2001, and there was no order staying the state proceedings or preventing the law days from running as scheduled, the defendant's motion to set aside the orders is denied as moot."  Id.  A copy of the court's decision was mailed to Mr. Gyadu on November 1, 2001.  Id. at 1.

At some time after the court issued its decision, Ms. O'Connell initiated the procedure followed before issuing Executions of Ejectment.  O'Connell Aff. ¶ 8.  That consists of checking that: (1.) a judgment of foreclosure has entered, and the date of the last judgment; (2.) more than 24 hours has passed since the last law day; (3.) no appeal is pending from the judgment of foreclosure and that the time for appeal had passed; (4.) no motion to reopen has been filed or, if one has, that it has been denied; (5.) no stay of execution is in effect; (6.) an order of possession in favor of the party seeking execution has been entered by the court; (7.) whether the party against whom the execution is being issued has exercised the equity of redemption by paying the mortgage debt or, if not, whether another encumbrancer has redeemed the property; and (8.) the information provided in the form is correct.  Id.  If those conditions are met, the execution is issued.  Id.

Upon reviewing the file, including the trial court's November 1, 2001 Memorandum of Decision, Ms. O'Connell concluded that the requirements were met in the case at issue.  Id. ¶ 9.  Specifically, she concluded that: (1.) a judgment of foreclosure had entered on January 4, 2000; (2.) nearly two months had passed since the last law day, when title vested in Bella Vista; (3.) Mr. Gyadu had appealed the judgment of foreclosure, up to and including filing a petition for certiorari with the United States Supreme Court, and his appeals had been dismissed; (4.) no motion to reopen was pending; (5.) no stay of execution was in effect; (6.) an order of possession in favor of Bella Vista had been entered by the court; (7.) neither Mr. Gyadu nor another encumbrancer had exercised the equity of redemption; and (8.) the information on the Execution for Ejectment was correct.  Id.; see also Memorandum of Decision in Bella

5

<u>Vista Condo v. Gyadu</u> at 1, 4 (finding that all of Mr. Gyadu's appeals of the foreclosure judgment had been exhausted and that there "was no order staying the state proceedings or preventing the law days from running as scheduled"); Notice of Judgment of Strict Foreclosure (Exh. A to O'Connell Aff.) (stating that "ORDER OF POSSESSION: shall enter upon vesting of title").  She then consulted with her supervisor, the Deputy Chief Clerk, to ensure that the issuance of the Execution of Ejectment was lawful.  O'Connell Aff. ¶ 9.  When he agreed with her assessment that the Execution of Ejectment was lawful, she signed the Execution of Ejectment.  <u>Id</u>.  Ms. O'Connell does not recall talking with Attorney Melchionne concerning the Execution of Ejectment at any point during the process.  <u>Id</u>. ¶¶ 11, 16.

After the Execution for Ejectment was issued, Mr. Gyadu filed a motion for rehearing, a motion to set aside the Execution for Ejectment, a motion for a stay of execution and a motion for a temporary restraining order.  <u>Id</u>. ¶ 14.  The court denied each of those motions.  <u>Id</u>.  At no point did Ms. O'Connell prevent Mr. Gyadu from filing any motion, raising any claims or seeking any form of appellate review.  <u>Id</u>.  ¶¶ 12-14. Indeed, Ms. O'Connell has "never personally refused a filing by Mr. Gyadu."  <u>Id</u>. ¶ 14.

On December 10, 2001, Mr. Gyadu filed a motion for extension of time to file an appeal from the trial court's ruling.  <u>Id</u>.  The court granted that motion.  <u>Id</u>.  Despite being granted additional time, Mr. Gyadu never sought to appeal the court's decision.

At some point after Ms. O'Connell signed the Execution for Ejectment, it was executed upon.  Ms. O'Connell had no involvement in that execution and no personal knowledge of what occurred in connection with that execution.  <u>Id</u>. ¶ 17.  Ms. O'Connell did not treat Mr. Gyadu any differently from anyone else in his situation and did not

discriminate against him, based on race or otherwise.  Id. ¶ 20.  Nor did she conspire

with Attorney Melchionne to engage in any unlawful activity.  Id. ¶ 21.

### III.    PROCEDURAL HISTORY AND OTHER ACTIONS

On December 5, 2001, Mr. Gyadu filed an action against Bella Vista alleging that

the "state foreclosure proceeding against him continued despite his removal of that

action to federal court."  Order in Gyadu v. Bella Vista Condos, 3-01-CV-2282 (JCH) at

2 (attached as exhibit 5).  The district court dismissed the action as frivolous,

concluding—as had the state court—that "[s]tates do not lose jurisdiction until the

defendant files a notice of removal in federal court" and that "[a] notice of appeal is not

filed . . . until the defendant pays the filing fee or the court grants the defendant's motion

to proceed in forma pauperis."  Id.  Since Mr. Gyadu never satisfied the requirements for

removal "the state court retained jurisdiction throughout the pendency of the state

action."  Id. at 3.  The court went on to hold further that the Rooker-Feldman doctrine

deprived it of jurisdiction over Mr. Gyadu's claim.  Id. at 4.

On January 7, 2002, Mr. Gyadu filed another action challenging, inter alia, the

state court's issuance of the Ejectment of Execution during the operation of the

automatic stay pending appeal and again alleging that the state court lacked jurisdiction

because he had attempted to file a removal petition.  Despite default having been

entered against Bella Vista, the court, sua sponte, dismissed the complaint as frivolous,

noting that Gyadu "has brought similar suits to this Court earlier, and they have been

decided adversely to him" and reasoning that the Bella Vista likely did not answer

because "it is getting tired of answering the same complaint."  Memorandum Decision in Gyadu v. Bella Vista Condos, 3: 02 CV 0027 (GLG) at 2 (attached as exhibit 6).[5]

On July 23, 2002, Mr. Gyadu filed his initial complaint in the instant action.  That complaint alleged that Ms. O'Connell's actions in connection with the issuance of the Execution for Ejectment violated Mr. Gyadu's rights to due process and equal protection as well as his First Amendment right to petition the courts for redress of grievances (and, by extension, 42 U.S.C. § 1983).  Initial Compl. at 1.  On August 30, 2002, this Court, sua sponte, dismissed the plaintiff's initial complaint as frivolous, holding that the plaintiff's claims were barred by both absolute and qualified immunity. Order of Dismissal at 3-6 (Docket Sheet No. 7).

On February 24, 2003, this Court granted Mr. Gyadu's motion to reopen the case and he filed the Amended Complaint at issue here on April 10, 2003.  The Amended Complaint again brought claims against Ms. O'Connell arising out of the state court's issuance of the Execution of Ejectment, alleging, inter alia, that her conduct in connection with the issuance of that execution violated Mr. Gyadu's constitutional rights. See, e.g.,  Amend. Compl. p. 1.  Ms. O'Connell answered the Amended Complaint in October 2003 and the Court ultimately set February 24, 2005 as the deadline for dispositive motions.

---

[5] On January 11, 2002, Mr. Gyadu filed another complaint against Bella Vista that the district court dismissed as frivolous, noting that "[s]ince July 12, 1994, Gyadu had filed at least twenty-one actions with this court. . . . In fact, the Second Circuit Court of Appeals currently bars him from filing any appeals without first obtaining permission from the circuit court."  Ruling and Order in Gyadu v. Bella Vista Condos, 3: 02-CV-75 (AHN) at 1 (attached as exhibit 7).

## IV.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact...and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In cases such as this, where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of her claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The movant's burden is "discharged by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact.  Celotex, 477 U.S. at 325.  The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial."  Id. at 324.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

To grant a motion for summary judgment in favor of the defendant, the court does not need to find that there is literally no evidence in favor of the plaintiff.  "The judge's inquiry...unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party...upon whom the onus of proof is imposed.'"  Liberty Lobby, 477 U.S. at 252.

Thus, an issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Liberty Lobby, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. A fact is not material unless it is, under controlling substantive law, an essential element of the nonmoving party's case with respect to which he has the burden of proof at trial. Id. at 248. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every essential element of his case so as to create a genuine issue for trial. Celotex, 477 U.S. at 323; Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995).

## IV.    ARGUMENT

### A.    The Plaintiffs' Fifth Amendment Due Process Claim Must Fail As A Matter of Law Because Ms. O'Connell is Not a Federal Official

The plaintiff alleges that Ms. O'Connell, a Assistant Clerk for the Connecticut Superior Court, violated his Fifth Amendment right to due process. That claim has absolutely no merit and must, on its face, fail as a matter of law. It is axiomatic "that the Due Process Clause of the Fifth Amendment applies solely to claims made against federal officials." Birdsall v. City of Hartford, 249 F. Supp. 2d 163, 170 (D. Conn. 2003) (emphasis added) (citing, inter alia, Public Utilities Comm'n v. Pollack, 343 U.S. 451, 461 (1952)); see also Dusenbery v. United States, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Therefore, the Fifth Amendment Due Process

Clause provides no basis for any of the plaintiff's claims against Ms. O'Connell, who is not a federal official.  See, e.g., Birdsall, 249 F. Supp. 2d at 170 (holding that "where the defendants are municipal, rather than federal, officials, a due process claim under the Fifth Amendment cannot be sustained").

### B. The Constitutional Protection Against Double Jeopardy Is Also Inapplicable Here

The plaintiff claims that his Fifth Amendment protections against double jeopardy were violated because "[h]ad the defendant allowed the appeal process to proceed, it is most likely that the court would reverse the decision to open the case and set new law days due to lack of jurisdiction pursuant to 28 U.S.C.S. sec. 1446(d)."  Compl. p. 63. That claim has several fatal flaws and must fail on its face.

The Double Jeopardy Clause "'protects only against the imposition of multiple criminal punishments for the same offense'"—it is inapplicable where, as here, the individual claiming a double jeopardy violation has not been the subject of any criminal proceeding.  SEC v. Palmisano, 135 F.3d 860, 864 (2d Cir. 1998) (quoting Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 493 (1997)) (emphasis in Hudson)[6]; see also Necula v. Conroy, 2000 U.S. Dist. LEXIS 8928, at *23-24 (S.D.N.Y. June 30, 2000) (Exh. 8) (granting defendants' motion for summary judgment on double jeopardy claim where plaintiff alleged several civil punishments, holding that "[t]he Double Jeopardy Clause, which plaintiff claims the DSS has violated, does not apply to this civil action").

---

[6] Although civil proceedings can under some circumstances be so punitive as to become criminal, there is a presumption that there is no punitive aspect to an in rem foreclosure action.  Cf. United States v. Ursery, 518 U.S. 267, 289 & n.3 (1996).

Moreover, the plaintiff's claims arise out of—and Ms. O'Connell had involvement in—only a single proceeding, namely the foreclosure action.  The protection against double jeopardy attaches only where there have been successive proceedings.  See, e.g., Hudson v. United States, 522 U.S. 93, 99 (1997) ("In the constitutional sense, jeopardy describes the risk that is traditionally associated with a criminal prosecution, and then only when such occurs in successive proceedings." (quotation marks and parentheses omitted)).

Lastly, the foreclosure action underlying the plaintiff's claims was initiated by private individuals, not the government.  See, e.g., Goyal v. United States, 103 F. Supp. 2d 802, 805-06 (D.N.J. 2000) ("'In order for the Double Jeopardy Clause to have any application, there must be actions by a sovereign, which place an individual twice in jeopardy. The Double Jeopardy Clause does not apply to actions involving private individuals.'" (quoting United States v. Beszborn, 21 F.3d 62, 67 (5th Cir. 1994)).[7] Accordingly, there can be no serious question that the Double Jeopardy Clause is inapplicable here as a matter of law.[8]

**C.  The Amended Complaint Does Not Allege a Valid Equal Protection Claim**

The plaintiff makes several conclusory allegations that his right to equal protection was violated.  See, e.g., Amend. Compl. pp. 52-59.  Those bare allegations, however, would not even have been sufficient to survive a motion to dismiss and

---

[7] Along similar lines, double jeopardy is inapplicable because the foreclosure action was not intended to punish the plaintiff for violating state law.

[8] The plaintiff's claim that Ms. O'Connell somehow obstructed him from appealing also lacks any basis in fact.  She had no control over whether the appeal process would proceed.  See O'Connell Aff. ¶ 12 (Exh. 1).  Indeed, the court granted the plaintiff an extension of time in which to file an appeal, but he made no effort to do so.

certainly are not enough to survive this summary judgment motion.  In particular, the plaintiff points to no other similarly situated individuals who were treated differently. That is fatal to his claim as a matter of law.  See, e.g., Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994) (noting that to allege a valid equal protection claim "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently"); Shimer v. Shingobee Island Water & Sewer Comm'n, 2003 U.S. Dist. LEXIS 4210, at *16 (D. Minn. Mar. 18, 2003) (Exh. 9) ("The absence of a similarly situated applicant is fatal to plaintiffs' equal protection claim."); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (noting that the "Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike").[9]  The plaintiff's putative equal protection claim is, in essence, nothing more than a rehash of his equally flawed due process claim, which also fails for the reasons set forth below.

### D. There Was No Violation of the Plaintiff's First Amendment Right to Petition the Government for Redress of Grievances

The plaintiff next claims that Ms. O'Connell's actions somehow violated his First Amendment right to petition the government for redress of grievances.  At the outset, it is worth noting the irony that the plaintiff—who has played a significant role in extending this foreclosure proceeding for the better part of a decade and has petitioned the government with such frequency and misguided vigor that he has been sanctioned by both the state and federal courts—claims that his right to petition has been infringed. That aside, his First Amendment claim is patently without merit.  Despite the plaintiff's

---

[9] The plaintiff's putative equal protection claim must also fail on the facts, because Ms. O'Connell in no way discriminated against the plaintiff.  See O'Connell Aff. ¶ 20 (Exh. 1).

apparent belief to the contrary, there simply is "no constitutional right to bring frivolous lawsuits." Connor v. Commissioner, 770 F.2d 17, 19 (2d Cir. 1985) (per curiam).

The plaintiff gives no indication of what conduct by Ms. O'Connell he believes supports a First Amendment claim. That is not surprising, given that Ms. O'Connell engaged in absolutely no conduct that implicated any of the plaintiff's First Amendment rights. To the extent any First Amendment claim can be extrapolated from the plaintiff's Amended Complaint, it appears to rest on his belief that Ms. O'Connell somehow limited his right of access to the courts. See Colondres v. Scoppetta, 290 F. Supp. 2d 376, 381 (E.D.N.Y. 2003) (noting that the right of access to the courts is bound up in the right to petition for redress of grievances). That claim should fail for several reasons.

The first, and most fundamental, reason is that the plaintiff makes absolutely no allegation that Ms. O'Connell herself prevented him from making any filing or otherwise obstructed his access to the courts and her affidavit definitively indicates to the contrary. See O'Connell Aff. ¶ 14 (Exh. 1). She did absolutely nothing to interfere with his access to the courts. See, e.g., Odom v. Poirier, 2004 U.S. Dist. LEXIS 25059, at *31 (S.D.N.Y. Dec. 10, 2004) (Exh. 10) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." (citations and quotation marks omitted)). That is fatal to the plaintiff's claim.

In his Amended Complaint, the plaintiff does make conclusory allegations that the "Chief Clerks . . . refused to accept for filing the plaintiff's motion to open and motion to set aside judgment pursuant to sec. 49-15" of the Connecticut Statutes, but

allegations that the Chief Clerks, Ms. O'Connell's <u>supervisors</u>, refused a filing without Ms. O'Connell's knowledge does not even come close to supplying a basis for a claim that Ms. O'Connell herself, the only defendant in this case, violated the plaintiff's constitutional rights. <u>See</u> Compl. p. 11; <u>see</u> <u>also</u> Compl. pp. 12-13, 55; O'Connell Aff. ¶¶ 2, 9, 21 (Exh. 1) (stating that Ms. O'Connell is an Assistant Clerk and is supervised by the Deputy Chief Clerk and Chief Clerk).  It is axiomatic that "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under" section 1983. <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 228 (2d Cir. 2004).[10]  The plaintiff has not even alleged—let alone established—that Ms. O'Connell was personally involved in any violation of his First Amendment rights.

Moreover, even if the plaintiff could somehow establish that Ms. O'Connell deliberately and maliciously interfered with his access to the courts (which he cannot), he cannot establish that the alleged conduct "materially prejudiced a legal action he sought to pursue" and therefore cannot properly allege a First Amendment violation. <u>See</u> <u>Odom</u>, 2004 U.S. Dist. LEXIS 25059, at *31 (Exh. 10).  In order for a plaintiff claiming a violation of his right to access to the courts to establish the "actual injury" necessary to support Article III standing, he must demonstrate that because of the defendant's actions "a nonfrivolous legal claim had been frustrated or was being impeded." <u>Lewis v. Casey</u>, 518 U.S. 343, 352 & n.3 (1996) (going on to note that

---

[10] The same is true of claims under section 1981, but, as will be discussed in detail below, that statute provides the plaintiff with no cause of action here even aside from his failure to allege personal involvement. <u>See</u> <u>supra</u>, IV(H); <u>see</u> <u>also</u> <u>Coger v. Connecticut</u>, 309 F. Supp. 2d 274, 281 (D. Conn. 2004) (holding that section 1981 does not provide cause of action against state officers).

"[d]epriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions").

The plaintiff cannot point to any such legal claim. The motion to open pursuant to section 49-15 of the Connecticut General Statutes that he points to as the primary example of an obstructed filing—and which Ms. O'Connell had no role in obstructing— was plainly frivolous.[11] That statute provides that no judgment of strict foreclosure "shall be opened after the title has become absolute in any encumbrancer." Conn. Gen. Stat. § 49-15. Title became absolute in Bella Vista when Mr. Gyadu and the other encumbrancers failed to redeem on their respective law days (well before Ms. O'Connell is alleged to have had involvement in the case). See, e.g., Crane v. Loomis, 128 Conn. 697, 700 (1942) (noting that "upon the failure to redeem on or before the law day . . ., title to the premises became absolute in the plaintiff"); see also City Lumber Co. v. Murphy, 120 Conn. 16, 25 (1935) ("Where a foreclosure decree has become absolute by the passing of the law days, the outstanding rights of redemption have been cut off and the title has become unconditional in the plaintiff, with a consequent and accompanying right to possession."). The statute makes clear that the plaintiff's attempt to open the judgment nearly two months after title became absolute in another encumbrancer was frivolous and therefore could not form the basis for a viable First Amendment claim, even if the plaintiff could establish that Ms. O'Connell had a role in

---

[11] The plaintiff also makes a passing reference to an alleged failure by the Chief Clerks to file a motion to set aside judgment on voidness grounds. Amend. Compl. p. 55-56. Again, the actions of Ms. O'Connell's supervisors cannot form the basis for a claim against her. Moreover, such a motion was clearly frivolous, as the foreclosure judgment had already been appealed through the entire court system, up to and including a petition for certiorari to the United States Supreme Court. See Memorandum of Decision in Bella Vista Condo v. Gyadu at 1 (Exhibit C to O'Connell Aff.).

obstructing its filing (which he does not even allege and Ms. O'Connell's affidavit expressly disclaims).[12]  To find a constitutional violation under these circumstances would improperly "trivialize the significance of the right to petition the government, making of the Constitution a font of tort law, and convert[ ] federal courts into small-claims tribunals."  Batista v. Rodriguez, 702 F.2d 393, 398 (2d Cir. 1983) (quotation marks omitted) (holding that the First Amendment was not violated even where the defendants were alleged to have insulted the plaintiffs and deliberately kept them waiting).

### E.  There is No Constitutional Right to an Appeal

The plaintiff alleges that Ms. O'Connell's actions violated his "constitutional right to an appeal."  Amend. Comp. p. 5.  There is no such constitutional right.  See, e.g., Abney v. United States, 431 U.S. 651, 656 (1977) ("[I]t is well settled that there is no constitutional right to an appeal.").  Therefore, the plaintiff's claim must fail.

### F.  The Plaintiff Had No Interest in The Property Protected by Due Process and, Even if He Did, He Was Afforded Ample Process

The plaintiff's primary claim—to which he devotes the bulk of his amended complaint—is that Ms. O'Connell's actions violated his right to due process.[13]  That claim should fail for a number of reasons.

---

[12] It is worth noting that plaintiff does not allege that Ms. O'Connell had any involvement in the action prior to the issuance of the execution for ejectment, which occurred well after the appeal of the initial judgment of strict foreclosure and denial of several of the plaintiff's related motions.

[13] The plaintiff alleges that Ms. O'Connell's actions violated his due process rights under both the Fifth and Fourteenth Amendments.  However, as discussed above, the Fifth Amendment Due Process Clause is inapplicable to state officers such as Ms. O'Connell.

The most fundamental reason is that the plaintiff had no property right in the condominium in November 2001 when Ms. O'Connell engaged in the conduct that forms the basis for the plaintiff's claims. As discussed above, title became absolute in Bella Vista in early September 2001 when Mr. Gyadu and the other encumbrancers failed to redeem on their respective law days. See, e.g., Crane v. Loomis, 128 Conn. 697, 700 (1942). Once the plaintiff failed to redeem the property and absolute title vested in an entity other than the plaintiff, he lost any "constitutionally protected property or entitlement interest" that he may have had in the property and, with it, any basis to challenge the notice he was provided nearly two months later in connection with the foreclosure proceedings. Pearson v. Dodd, 429 U.S. 396, 397-98 (1977) (per curiam); see also Green v. City of Boston, 966 F. Supp. 117, 119 (D. Mass. 1997) ("Because the plaintiffs had lost title and all rights of redemption to the property as of March 1992, they did not have any constitutionally protected right to object to or be notified of the property's sale."). That alone requires the dismissal of his due process claim.

Moreover, even if the plaintiff did have a constitutionally protected interest at the time the execution of ejectment was issued, he was given numerous opportunities to raise his objections to that order. He filed a motion to reargue the court's decision, a motion for order, a motion for a restraining order and a motion for a stay, each of which was considered and denied by the court. See Docket Sheet in Bella Vista Condo v. Gyadu at 10 (Exh. 3). The plaintiff was given far more than the process that was due.

The gravamen of the plaintiff's due process claim is that Ms. O'Connell's actions somehow deprived him of the opportunity to appeal the Connecticut Superior Court's November 1, 2001 decision. That claim is utterly without merit. As discussed above,

the plaintiff had no interest in the property protected by due process at the time of that

decision.  That precludes any due process claim.  More fundamentally, the plaintiff was

actually granted an extension of time to file an appeal to the extent such an appeal was

permitted under Connecticut law.  He failed to do so.  <u>See</u> Amend. Compl. 21-22.[14]

Although such a filing perhaps would have been futile because the plaintiff has failed to

pay the sanctions imposed on him by the Appellate Court and is therefore barred from

filing appeals, that bar has absolutely nothing to do with Ms. O'Connell and she in no

way acted to preclude him from seeking appellate remedies, nor did she have the power

to do so.  O'Connell Aff. ¶ 12 (Exh. 1).  The plaintiff's due process claim against her is

frivolous.

        To the extent the plaintiff seeks to challenge the initial foreclosure judgment on

due process grounds, that challenge must also fail.  There can be no serious doubt that

the plaintiff was provided ample process before he forfeited his constitutionally

protected rights in the property by failing to redeem it before the passing of the law

days.  As the Connecticut Superior Court noted, the plaintiff's "appeal of the original

foreclosure judgment was dismissed and all appellate procedures including a writ of

certiorari to the U.S. Supreme Court were exhausted."  Memorandum of Decision in

<u>Bella Vista Condo v. Gyadu</u> at 1 (Exh. C to O'Connell Aff.).  Moreover, after the court

reopened that initial foreclosure judgment (which had already been appealed through

the entire court system), the plaintiff filed no fewer than eight separate motions seeking

to challenge the decision or stay the proceedings and each of those motions was heard

---

[14] Nor did the plaintiff seek to appeal the trial court's granting of the foreclosure plaintiff's
request to open the judgment.  <u>See</u> <u>Brann v. Savides</u>, 48 Conn. App. 807, 808 (1998)
(appeal from trial court "order to open the judgment and set new law days").

and denied by either a state or federal court.  See id. at 2-3.  The plaintiff cannot credibly allege that he was somehow deprived of his right to due process and, even if he could, any such deprivation could in no way be attributed to Ms. O'Connell, who is not alleged to have had any involvement in the case until well after the law days had passed and any property rights the plaintiff may have once had were extinguished.

### G. Ms. O'Connell Cannot Be Held Liable for Any Actions in Which She Had No Personal Involvement

Large portions of the plaintiff's Amended Complaint detail the decade-long saga of this foreclosure action.  The only events in which the plaintiff even alleges Ms. O'Connell had any personal involvement are those surrounding the issuance of the execution for ejectment in November 2001, over seven years after the action was filed. Thus, to the extent the Amended Complaint sets forth allegations about the "alleged hoax, fraudulent foreclosure action which the plaintiff's condominium association, Bella Vista Condos, brought against the plaintiff," those allegations cannot support a claim against Ms. O'Connell.  Amend. Compl. p. 5; see, e.g., Patterson v. County of Oneida, 375 F.3d 206, 228 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under" section 1983).  The same is true of the plaintiff's allegations arising out the execution itself, in which Ms. O'Connell was not involved.  O'Connell Aff. ¶ 17 (Exh. 1); Amend. Compl. p. 50-52 (alleging Fourth Amendment violation based on the conduct of Condominium staff and counsel).

**H.  The Plaintiff's Claims Under 42 U.S.C. §§ 1981, 1983 and 1985
Lack Merit**

Like the rest of the plaintiff's claims, his claims pursuant to 42 U.S.C. sections

1981, 1983 and 1985 (hereinafter "§ 1981", "§ 1983" and "§ 1985," respectively) lack

merit.  At the outset, it should be noted that § 1981 does not provide the plaintiff with a

cause of action against Ms. O'Connell, a state employee, because "when a person's

rights protected by § 1981 are violated by a state actor (as opposed to a private

person), the aggrieved party has a cause of action pursuant to 42 U.S.C. § 1983, not 42

U.S.C. § 1981." Coger v. Connecticut, 309 F. Supp. 2d 274, 281 (D. Conn. 2004); see

also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989) ("[T]he express action at

law provided by § 1983 . . . provides the exclusive federal damages remedy for the

violation of the rights guaranteed by Section 1981 when the claim is pressed against a

state actor." (internal quotations omitted)); Patterson v. County of Oneida, 375 F.3d 206,

224 (2d Cir. 2004) (same).  For the plaintiff's § 1983 claim to survive summary

judgment, he must allege and provide evidence creating a genuine issue of material fact

as to whether Ms. O'Connell's conduct violated the United States Constitution or a

federal statute granting enforceable rights to the plaintiff.  See, e.g., Concourse Rehab.

& Nursing Ctr. Inc. v. Whalen, 249 F.3d 136, 143 (2d Cir. 2001) ("Section 1983 provides

a cause of action for violations of federal statutes as well as the Constitution.  In order to

seek redress through § 1983, however, a plaintiff must assert the violation of a federal

right, not merely a violation of federal law.").  This he has not done, and cannot do.

As discussed in detail above, the plaintiff has failed to sufficiently allege—let

alone establish—any constitutional violation.  Thus, for the plaintiff to have a viable §

1983 claim, he would have to establish a violation of a federal statutory right.  His

amended complaint mentions two statutes that can, under some circumstances, confer federal rights: § 1981 and § 1985.[15]  However, neither statute supports a claim by the plaintiff here.

At the outset, the plaintiff does not make any allegations in his Amended Complaint that Ms. O'Connell intentionally discriminated—or conspired to discriminate— against him based on his race.  Indeed, he does not even allege that he is a member of a racial minority.  Those failures are fatal to any claim based on either § 1981 or § 1985.  See, e.g., Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 1999) ("To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities."); Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994) ("To recover under section 1985(3), a plaintiff must allege 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); Boomer v. Bruno, 134 F. Supp. 2d 262, 269 & n.6 (N.D.N.Y. 2001) (noting that failure to allege racial motivation required dismissal of both § 1981 and § 1985 claim).[16]  Moreover, even if the

---

[15] The Amended Complaint also makes a reference to the removal statute in support of the plaintiff's claim that the defendant's actions violated the constitutional prohibition on double jeopardy.  Amend. Compl. p. 63.  However, as this Court recognized in dismissing the plaintiff's initial complaint, § 1446 "merely sets forth the rules governing removal of cases from state court to federal court, and provides no cause of action."  Order of Dismissal at 3 (Docket Sheet No. 7).  Thus, it does not confer a federal right for purposes of § 1983.

[16] The pro se plaintiff is well aware of this requirement, as he has had other claims dismissed in other actions because his complaint "only vaguely refer[red] to some 'conspiracy' and hint[ed] at some tenuous link between this 'conspiracy' and the fact

plaintiff had alleged intentional racial discrimination, his claims would still fail because he has not presented—and cannot present—any "credible evidence that the actions of the individual appellees were motivated by racial animus or ill-will" because such evidence does not exist.  Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 234-35 (2d Cir. 2002).

Beyond that, the plaintiff's § 1981 and § 1985 claims must also fail because he has failed to establish that he was discriminated against in the exercise of any federal right, or deprived of any such right.  See, e.g., Brown, 221 F.3d at 339, 341 (providing that a valid § 1981 claim requires a showing of "discrimination concerning one of the statute's enumerated activities" and that a valid § 1985(3) claim requires a showing that the plaintiff was "deprived of any right of a citizen of the United States" (quotation marks omitted)).  As discussed above in the context of the plaintiff's putative equal protection claim, the plaintiff does not allege that any other similarly situated person was treated differently and that is fatal to his § 1981 claim, which, like an equal protection claim, requires a showing of disparate treatment.  See, e.g., id. at 339 (holding that "plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause" and that their claims must fail because they did not allege instances in which "similarly situated" non-minorities were treated differently).  More fundamentally, as discussed above, the plaintiff does not allege the violation or

---

that he is black." Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999).  Here, he does not even allege that he is a member of a protected class, let alone that the alleged conspiracy was based on animus against him because of his race.

infringement of any federally protected right[17] and that requires dismissal of both his §

1981 and § 1985 claims.  See, e.g., Brown, 221 F.3d at 339, 341 (violation of federal

right is requirement for both § 1981 and § 1985 claim).[18]  Consequently, his claims must

fail.

### I.  Even if Ms. O'Connell Had Violated the Plaintiff's Rights, She is Protected By Both Absolute and Qualified Immunity

This Court dismissed the plaintiff's initial complaint pursuant to 28 U.S.C. §

1915(e)(2)(B) because Ms. O'Connell's "conduct is protected by (1) judicial immunity

because she was carrying out a judicial function under direction of the court and (2)

qualified immunity because, even if she engaged in conduct that was prohibited by

federal law, her conduct was objectively reasonable."  Order of Dismissal at 3 (Docket

Sheet No. 7).  That reasoning applies with equal force to the plaintiff's Amended

Complaint.  Indeed, there is no meaningful difference between the plaintiff's Original

Complaint and his Amended Complaint—both rely on the same conduct by Ms.

O'Connell and even, at times, use identical language.  Consequently, the plaintiff's

amended complaint should also be dismissed on immunity grounds.

---

[17] Nor has he been deprived of any right protected under state law.  See, e.g., Order of
Dismissal at 3 (Docket Sheet No. 7).  Of course, even if he had, that would not provide
the basis for a claim under any of the enumerated federal statutes.

[18] Even if the plaintiff had validly pled a § 1985(3) conspiracy claim, the evidence clearly
demonstrates that the defendants did not act in concert with the "predominant purpose
of . . . interfere[ing] with, or punish[ing the plaintiff] for, the exercise of [a federal] right."
Spencer v. Casavilla, 44 F.3d 74, 79 (2d Cir. 1994); see O'Connell Aff. ¶ 21 (Exh. 1).

1. __The Law of the Case Doctrine Should Bar the Plaintiff From Re-Litigating the Same Issues Decided in this Court's Initial Dismissal__

The plaintiff's Amended Complaint raises essentially the same claims arising out of the same operative facts as his initial complaint, which this Court correctly dismissed pursuant to absolute and qualified immunity.  Order of Dismissal at 3 (Docket Sheet No. 7).  Although the plaintiff's Amended Complaint is longer than his initial complaint, that length is largely attributable to his repetition of the alleged facts he believes support his claims and his efforts to argue that this Court's initial dismissal was improper.  Those changes in no way alter the substance of his claims, which arise out of the same facts and are functionally identical to those raised in his initial complaint.  Therefore, the law of the case doctrine bars the plaintiff from re-litigating the issues this Court has already correctly decided.

Although it deals with the related doctrine of res judicata, the Southern District of New York's decision in Cieszkowska v. Grayline N.Y., 2001 U.S. Dist. LEXIS 16070 (S.D.N.Y. Sept. 24, 2001), aff'd, 295 F.3d 204 (2d Cir. 2002) (per curiam) (Exh. 11), is instructive.  See Rezzonico v. H & R Block, Inc., 182 F.3d 144, 148 (2d Cir. 1999) ("Law of the case and res judicata are closely related legal concepts both resting on policy considerations favoring putting an end to litigation, saving judicial time, and bringing certainty to legal relations.").  In Cieszkowska, the plaintiff filed a complaint in forma pauperis in district court alleging wrongful termination of her employment.  Cieszkowska, 2001 U.S. Dist. LEXIS 16070 at *3.  The district court dismissed that complaint pursuant to 28 U.S.C. § 1915(e)(2) and the plaintiff appealed that dismissal.  Id. at *4-5.  While that appeal was pending, the plaintiff filed a second action in forma

paupers in district court.  Id. at *5.  Although that second complaint was "nearly three

times as long as the First Complaint, [it] focuse[d] on essentially the same set of facts

as contained in the First Complaint," despite raising a Title VII claim that had not been

raised in the initial complaint.  Id.

The district court dismissed the second action on res judicata grounds.[19]  In so

holding, the court noted that "[w]hile the Supreme Court has held that a dismissal under

the in forma pauperis statute is not a 'dismissal on the merits' precluding the

subsequent filing of a paid complaint, it also found that a Section 1915 dismissal 'could

have a 'res judicata' effect on subsequent in forma pauperis lawsuits.'"  Id. at *12-13

(quoting Denton v. Hernandez, 504 U.S. 25, 34 (1992)).  Therefore, since the plaintiff's

first and second actions were both filed in forma pauperis, the dismissal of the first

complaint operated as res judicata on the claims raised in the plaintiff's second

complaint arising out of the same facts even though the second complaint was

significantly longer and added another claim.  Id. at *13.

That reasoning applies with equal force here and militates in favor of applying the

law of the case doctrine to dismiss the plaintiff's attempt to re-litigate the issues this

Court has already correctly decided.  See Rezzonico, 182 F.3d at 148 ("[T]he doctrine

[of law of the case] posits that when a court decides upon a rule of law, that decision

should [generally] continue to govern the same issues in subsequent stages in the

same case." (quotation marks omitted; alteration in original)).  The plaintiff's Amended

Complaint arises out of the same facts as his initial complaint, which this Court properly

dismissed on immunity grounds.  He should not be permitted to get yet another bite at

---

[19] That decision was subsequently affirmed by the Second Circuit.  Cieszkowska v.
Grayline N.Y., 295 F.3d 204 (2d Cir. 2002) (per curiam).

the apple—and exhaust yet more of this Court's, and the judicial system's, resources—

simply by amending his complaint to repeat the same meritless claims and alleged facts

over and over again.  Instead, this Court should dismiss the plaintiff's Amended

Complaint pursuant to the law of the case doctrine.  See, e.g., North River Ins. Co. v.

Philadelphia Reinsurance Corp., 63 F.3d 160, 165 (2d Cir. 1995) ("A court should be

'loathe' to revisit an earlier decision 'in the absence of extraordinary circumstances such

as where the initial decision was clearly erroneous and would work a manifest

injustice.'" (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817

(1988)).

### 2.  This Court Correctly Held that Ms. O'Connell's Actions Are Protected by Absolute Immunity

As this Court correctly recognized in dismissing the plaintiff's initial complaint, the

Second Circuit has held that "even if a court clerk is only performing an administrative

task, she . . . is entitled to immunity because of the nature of the function being

performed."  Order of Dismissal at 4 (Docket Sheet No. 7); see also Rodriguez v.

Weprin, 116 F.3d 62 (2d Cir. 1997).  "Accordingly, the complaint should be dismissed

because O'Connell was at all relevant times performing administrative tasks that were

an integral part of the judicial process."  Order of Dismissal at 4-5.

As discussed above, the amendments to the plaintiff's complaint do nothing to call

into question this Court's initial decision holding that Ms. O'Connell's actions were

protected by absolute immunity.  The plaintiff alleges no new facts that could call into

question this Court's initial decision, nor could he credibly make such allegations.  The

evidence clearly establishes that Ms. O'Connell "was at all relevant times performing

administrative tasks that were an integral part of the judicial process" and that her

conduct is therefore protected by absolute immunity.  Order of Dismissal at 4-5; <u>see also</u> O'Connell Aff. ¶ 21 (Exh. 1).

### 3.  This Court Also Correctly Held that Ms. O'Connell is Shielded by Qualified Immunity

In dismissing the plaintiff's initial complaint, this Court also correctly held that Ms. O'Connell was shielded by qualified immunity because her "actions were, as a matter of law, objectively reasonable."  Order of Dismissal at 6 (Docket Sheet No. 7).  As the Amended Complaint alleges, and the evidence establishes, she "issued an order of ejectment of Gyadu after (i) a trial, (ii) the entry of a judgment of strict foreclosure against him, and (iii) the dismissal of his appeal."  <u>Id</u>.  Her actions violated none of the plaintiff's constitutional rights.  Moreover, even if they had, there can be no doubt that her conduct was objectively reasonable.  <u>See, e.g.</u>, <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000) (qualified immunity protects public officials if it was objectively reasonable for them to believe that their conduct did not violate clearly established law).

Again, the plaintiff's Amended Complaint does nothing to call into question this Court's initial conclusion.  It does not—and could not credibly—challenge the fact that Ms. O'Connell issued the order for ejectment of Gyadu after he had received a trial, judgment had been entered against him and his appeal had been dismissed.  <u>See id</u>.; <u>see also</u> Memorandum of Decision in <u>Bella Vista Condo v. Gyadu</u> at 1 (Exh. C to O'Connell Aff.) (noting that the plaintiff's "appeal of the original foreclosure judgment was dismissed and all appellate procedures including a writ of certiorari to the U.S. Supreme Court were exhausted").  The plaintiff seeks to avoid qualified immunity by adding a section to his Amended Complaint arguing that "Qualified Immunity Not Applicable to Defendants Acts" and claiming that his claims are not barred because,

inter alia, the defendant's actions were allegedly "malicious" and "short circuited the due

process of law." Amend. Compl. pp. 64-67. Of course, such conclusory allegations do

not change the fact that Ms. O'Connell's actions were objectively reasonable. See, e.g.,

Duamutef v. Hollins, 297 F.3d 108, 113 (2d Cir. 2002) (noting that "[i]t has long been

established that the qualified immunity standard . . . is an objective one. An official's

subjective intent, motivation or belief is generally irrelevant" and that even under limited

circumstances where motive is relevant a "particularized proffer of evidence of

unconstitutional motive" is required to defeat a motion for summary judgment).

Moreover, as discussed above, her actions did not violate any of the plaintiff's

constitutional rights. See id. at 113 n.1 (noting that where "there is no constitutional

violation, there typically is no need to address whether defendants are also protected by

qualified immunity--although qualified immunity becomes obvious at that point").

Therefore, qualified immunity imposes yet another independent bar to the plaintiff's

claims.

### J. **This Court Lacks Jurisdiction Over this Action to the Extent the Plaintiff Seeks to Challenge State Court Judgments**

"The Rooker-Feldman doctrine holds that inferior federal courts lack subject

matter jurisdiction over cases that effectively seek review of judgments of state courts

and that federal review, if any, can occur only by way of a certiorari petition to the

Supreme Court." Phifer v. City of New York, 289 F.3d 49, 55 (2d Cir. 2002) (quotation

marks omitted).[20] The doctrine applies to bar district court jurisdiction not only over

direct challenges to state court rulings, but also to putatively distinct claims brought in

---

[20] It is worth noting that the plaintiff has already exercised all avenues of appellate
review, including a petition for certiorari to the United States Supreme Court.
Memorandum of Decision in Bella Vista Condo v. Gyadu at 1 (Exh. C to O'Connell Aff.)

district court that are "inextricably intertwined" with a state court decision.  Id. at 55-56.

Such federal claims are "'inextricably intertwined with the state-court judgment if the

federal claim succeeds only to the extent that the state court wrongly decided the issues

before it.'"  Id. at 56 (quoting Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25 (1987)

(Marshall, J., concurring)).

      The plaintiff's Amended Complaint is devoted to attacking what he views as the

"fraudulent, hoax foreclosure action" which culminated in the state court's judgment of

strict foreclosure and resulted in the order of execution for ejectment which gave rise to

the plaintiff's instant claims against Ms. O'Connell.  He claims (incorrectly) that his rights

were violated because he was somehow deprived of his ability to obtain an appeal and,

inter alia, that "[h]ad the defendant allowed the appeal process to proceed, it is most

likely that the court would reverse the decision to open the case and set new law days

due to lack of jurisdiction pursuant to 28 U.S.C.S. sec. 1446(d)."  Amend. Compl. 63-64.

On its most basic level, the plaintiff is seeking to have this Court review the state court's

holding that the plaintiff's attempt to file a removal petition did not deprive that court of

jurisdiction and that "[s]ince th[at] court had jurisdiction when it denied [Gyadu's]

motions on August 27, 2001, and there was no order staying the state proceedings or

preventing the law days from running as scheduled, the defendant's motion to set aside

the orders is denied as moot."  Memorandum of Decision in Bella Vista Condo v. Gyadu

at 4 (Exh. C to O'Connell Aff.); see also Order in Gyadu v. Bella Vista Condos, 3-01-CV-

2282(JCH) at 2-3 (Exh. 5) (dismissing as frivolous previous complaint by the plaintiff

raising same jurisdictional argument).[21]  That is a quintessential example of what the

Rooker-Feldman doctrine bars.  See, e.g., Gentner v. Shulman, 55 F.3d 87, 89 (2d Cir.

1995) ("Under [the Rooker-Feldman] doctrine, federal district courts lack jurisdiction to

review state court decisions whether final or interlocutory in nature.").[22]  More broadly,

the plaintiff's entire complaint against Ms. O'Connell is based on the premise that he

had some kind of protected interest in the property at the time the order of excecution

for ejectment was issued.  Were this court to agree with that premise, it would

necessarily imply the invalidity of the state court's judgment.  See Memorandum of

Decision in Bella Vista Condo v. Gyadu at 4 (denying motion to set aside orders as

moot because the law days had already run).  Consequently, the Rooker-Feldman

doctrine precludes this Court from exercising jurisdiction over the plaintiff's claims.

## V.    CONCLUSION

For all of the foregoing reasons, the defendant is entitled to summary judgment

as a matter of law.

---

[21] Because the district court has already decided this issue, res judicata would also bar
the plaintiff's claim to the extent it is premised on his claim that the state court lacked
jurisdiction.  Res judicata also bars plaintiff's claims to the extent they have already
been dismissed by other district courts.  See supra pp. 7-8 (discussing other district
court cases addressing issues arising out of the same facts).

[22] The same is true of the plaintiff's claims to the extent they challenge aspects of the
strict foreclosure judgment itself.  See Order in Gyadu v. Bella Vista Condos, 3-01-CV-
2282(JCH) at 3-4 (Exh. 5) (dismissing on Rooker-Feldman grounds as frivolous
complaint by plaintiff challenging state court proceedings).

DEFENDANT

MAURA O'CONNELL

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     _____
        Robert J. Deichert
        Assistant Attorney General
        Federal Bar No. ct24956
        55 Elm Street
        P.O. Box 120
        Hartford, CT  06141-0120
        Tel: (860) 808-5020
        Fax: (860) 808-5347
        Robert.Deichert@po.state.ct.us


## CERTIFICATION

I hereby certify that a true and accurate copy of the foregoing Memorandum in

Support of Motion for Summary Judgment was served in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure by first-class mail, postage prepaid, on this 24th

day of February, 2005 to:

    Ben Gyadu
    P.O. Box 4314
    Waterbury, CT 06704


        _____
        Robert J. Deichert
        Assistant Attorney General