Page 23

50. After inhaling the heavy smoke from the fire, the plaintiff found himself coughing and having pains in the eye and chest

51. The fire-service personnel head adviced the plaintiff to go to the hospital for check-up

52. Consequently the plaintiff visited the emmergency department of the Waterbury hospital where the plaintiff was treated of the symptons of the problems he experienced as a result of inhaling the heavy smoke

53. The plaintiff did not finish treatment nor recover from the shock of the unexpected fire incident nor did the fire service have time to determine the cause of the fire

Page 24

before counsel for Bella Vista Condos, in their over ambition to use only foul means and foul means only, LAWLESS acts, without which they know they could NEVER LEGALLY take possession of the plaintiff's property, as they did, brought their eviction team at the plaintiff's door at 8 a.m. on the 30th Nov., 2001, not even fourteen (14) days after the fire incident, to eject the plaintiff from his home so as to possess the property and additionally deprive him of any physical evidence he might need in order to recover his losses as a result of the fire incident

54. Counsel for Bella Vista Condos therefore DELIBERATELY deprived the plaintiff of any physical evidence which would assist him

Page 25

to recover his losses due to the fire incident and while he was still in shock and undergoing treatment, counsel LAWLESSLY, CALLOUSLY and MALICIOUSLY ejected the plaintiff from his home so that they could possess the property, regardless

55. The plaintiff met the ejectment team at the door when they arrived at 8 a.m. on that 30th Nov., 2001 and told them that they did not have any legal right to eject him.

(56) The plaintiff stated that there were pending appeals and those that were yet to be exercised and therefore they did not have any legal standing to eject him

57. The plaintiff added that the Ejectment Order was FRAUDULENT and hence VOID because it was

Page 26

obtained as a result of COLLABORATION and CONSPIRACY between Counsel for Bella Vista Condos and the clerk who issues Ejectment Orders without which the Ejectment Order could NEVER have been issued in 24 hours of filing the Memorandum of Decision and worse yet in eleven (11) minutes or 1/6 hr. of filing the application for Ejectment Order when the same clerk takes over one week to issue an execution order against even a thin file of just one volume rather than a file of 7 large volumes, as the file in question

58  Plaintiff continued that there was a pending complaint for Injunctive Relief whose issue must be resolved before any Ejectment

59  Plaintiff added that the Ejectment Order was

Page 27

in violation of Due Process and Equal Protection of laws as it flouted the demands of Section 49-15 of the CT Gen. Statute Annotated and Sec. 4-3 and Section 61-11 of the CT Practice Book and therefore the Ejectment Order was, again, NULL and VOID.

60  Plaintiff concluded that for as long as the Counter-claim of the action was pending, they did not have any legal right to eject him.

61  Counsel for Bella Vista Condos responded that there was no pending appeal and with that the ejectment team, including the State Marshalls, ignored totally the plaintiff's warnings against their ejectment and proceeded with the alleged lawless, fraudulent, malicious ejectment as they planned it

Page 28

62. The eviction team therefore asked the plaintiff to open the door or they ask a locksmith they brought with them to open it

63. Plaintiff did not have a choice but to open the door

64. As soon as the door was open they started removing the plaintiff's possessions into a moving van in a rush and carelessly

65. The possessions that they could not put in the moving van without dismantling them, they dismantled them.

66. The plaintiff's possessions were removed in a rush and so carelessly that the possessions suffered heavy losses and damages, causing constant complaints from the plaintiff who was witnessing his life-time possessions being ruined before his

Page 29

own eyes as a result of UNLAWFUL and ILLEGAL acts and yet unable to stop it

67  Due to the careless way by which the possessions were being removed, it was a commonplace to find that while a furniture, for example, had been removed to the warehouse, other parts, such as rollers, bolts and nuts, would still be found scattered about in the apartment.

68  At the middle of removing the plaintiff's possessions, Attorney Melchionne, Counsel for Bella Vista Condos., who apparently wanted to go home when plaintiff's possessions were still in the apartment, grew impatient about the way the plaintiff was removing his possessions from the attick, carrying the possessions from the attick by a folding ladder to the bed-room floors and back to the attick

Page 30

repeating the cycle.

69. Attorney Melchionne therefore decided to stand at the foot of the folding ladder at the bed-room floors to collect the possessions from the plaintiff and put them at the bed-room floors.

70. On one of such trips, the plaintiff did not find Attorney Melchionne at the foot of the folding ladder when he brought a load from the attick.

71. The plaintiff therefore had to bring down the load to the bed-room floors by the folding-ladder and go back to the attick to continue removing his possessions and thereby repeating the cycle of back and forth the folding ladder process of removing the possessions from the attick.

Page 31

72. As it turned out, Attorney Melchionne left the plaintiff to join the rest of the ejectment team to deduce a plan by which they could get the plaintiff out of the building and lock it up and leave, regardless of the fact that the plaintiff had not finished removing his possessions

73. Attorney Melchionne and the eviction team including the State Marshalls therefore COLLABORATED and CONSPIRED to use the Coup D'etat kind of tricks to get the plaintiff out of the building

74. Attorney Melchionne and the eviction team called the plaintiff to come out of the building and see something

75. Plaintiff responded that he would soon finish and come down

Page 32

76  Attorney Melchionne and his eviction team asked the plaintiff to stop the packing and come down immediately and go right back to continue the packing.

77  Just when the plaintiff stepped out of the building and the plan was only to trick the plaintiff to get him out of the building, Attorney Melchionne locked-up the doors behind the plaintiff

78  What plaintiff was asked to come and see immediately happened to be nothing but a 2nd inventory form which had been filled-up and so the plaintiff had to sign it as he did with the 1st one.

79  When plaintiff signed it and headed back the building to continue with removing his possessions as

Page 33

plaintiff was told but that was only lies intended to deceive the plaintiff to get him out of the building, Attorney Melchionne would not allow the plaintiff back in the building

80  The plaintiff was shocked and dumbfounded beyond description about that DISHONEST, COUP D'E-TAT act that was played upon him to cause him to leave his possessions in the building when he least expected it

81  This resulted in a vehement argument between the plaintiff and Attorney Melchionne in which Attorney Melchionne stated that the plaintiff would not come out of the building if he was allowed back in the building.

82  When nothing the plaintiff did or said made any